(C. D. 1654)

Ensign-Bickford Co. (Simsbury, Conn.)
C. S. Emery & Co. } *v.* United States

United States Customs Court, Second Division

(Decided November 10, 1954)

*Sharretts, Paley & Carter (Howard C. Carter* of counsel) for the plaintiffs.
*Warren E. Burger,* Assistant Attorney General (*Richard H. Welsh,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Certain imported merchandise, designated on the entries as "Connectors for Igniter Cord," was classified by the collector of customs as articles in chief value of metal, not specially provided for, in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), and duty was assessed thereon at the rate of 22½ per centum ad valorem.)

The plaintiffs contend, in the alternative, that the articles should have been classified as "mining, blasting, or safety fuses of all kinds" within the purview of paragraph 1517 of said act (19 U. S. C. § 1001, par. 1517) and assessed with duty at the rate of $1 per thousand feet, or classified as "all other explosive substances, not specially provided for," in paragraph 1687 of said act, as amended by Public Law 316 of the 73d Congress, 48 Stat. 943 (65 Treas. Dec. 1014, T. D. 47117) (19 U. S. C. § 1201, par. 1687) and entitled to entry free of duty.

The cited statutes, so far as pertinent, are here set forth:

Paragraph 397 of the Tariff Act of 1930, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Composed wholly or in chief value of iron, steel, lead, copper, *brass*, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or

silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

Other (except slide fasteners and parts thereof)_____22½% ad val.
[Emphasis added.]

Paragraph 1517 of said act:

PAR. 1517. * * * mining, blasting, or safety fuses of all kinds, $1 per thousand feet.

Paragraph 1687 (free list) of said act, as amended, *supra*:

PAR. 1687. Gunpowder, sporting powder, and all other explosive substances, not specially provided for, and not wholly or in chief value of cellulose esters.

The following six exhibits, illustrative or otherwise, introduced by plaintiffs were received in evidence:

Exhibit 1 consists of a cardboard box, containing approximately 100 individual connectors, which are representative of the importation. They are made of brass, are approximately 1⅜ inches in length and three-sixteenths of an inch in diameter, being open at one end with a slot cut at the other end. They contain a small amount of black powder and minimum amounts of antimony sulphide, lead peroxide, and calcium stearate.

Exhibit 2, a photograph depicting the connector, safety fuse, and igniter cord marked, respectively, "A," "B," and "C."

Exhibit 3, a photograph showing a closeup portion of exhibit 4 with a miner actually lighting the end of the igniter cord. A connector, safety fuse, and igniter cord are marked "A," "B," and "C," respectively.

Exhibit 4, a photograph showing the "face" of a mine with the holes drilled, loaded with explosives, and with a safety fuse (marked "B") protruding from each hole. On the end of each safety fuse is a connector marked "A," which is, in turn, fastened to the igniter cord marked "C."

Exhibit 5, letters patent No. 2,587,694, issued to John B. Chalmers and Francis H. G. McCaffrey, inventors of the subject connectors.

Exhibit 6, an assemblage consisting of one of the connectors, together with a safety fuse (orange material) and igniter cord.

At the trial, two witnesses were called, both of whom testified on behalf of plaintiffs, and their testimony stands unrebutted.

The first witness, Newbold LeRoy, testified in substance as follows: That for 16 years he had been associated with the Ensign-Bickford Co., which is engaged in the manufacture and sale of safety fuses and detonating fuses; that for 5 years he had been familiar with the subject merchandise; that it is inflammable but not explosive; that it is used in the mining and quarrying industries, being so employed as to enable a miner to ignite a number of fuses in one continuous operation in rotation, thereby allowing a miner, after lighting a fuse, to

leave the "face" of the mine or quarry and to avoid the danger attendant upon a less advanced method of performing such operations; that this is accomplished by placing a connector upon the end of each length of fuse and connecting it to a so-called igniter cord.

·With the use of exhibit 2, the witness explained the function of the connector, marked "A," stating that each length of safety fuse in a "round" has one connector on the end, the purpose being to connect the two igniter cords in such a way that the rotation of the shot may be obtained; that in the "face" of the mine there may be anywhere from 5 to 50 holes, which constitute what is termed a "round," and that all holes are exploded in a predetermined rotation.

LeRoy further testified that the safety fuse, marked "B" on exhibit 2, is the means whereby the flame is transmitted to the blasting cap for the purpose of setting off the explosive in the hole; that the fuse is lighted at one end by means of the igniter cord and "spits" through the other end into the blasting cap, no flame being visible from the burning safety fuse; and that the igniter cord, marked "C" on exhibit 2, burns with an outward flame at a predetermined rate. Another important feature of the connectors is that when they are properly crimped on the end of safety fuses the latter become thoroughly waterproof and that, so far as this witness knew, the only use for the connectors is to connect safety fuses with igniter cord.

On cross-examination, LeRoy testified that the articles in controversy are sold as igniter cord connectors; that igniter cord is sold as igniter cord; that his company manufactured and sold safety fuses which are recognized as distinct from igniter cord connectors; that in use the igniter cord is lighted by a match, the flame then travels outwardly along the igniter cord until it comes in contact with the connector which is ignited into a flare or flame and, in turn, lights the fuse; that the flame then passes on through the fuse until it strikes the percussion cap and explodes it.

Further, on cross-examination, LeRoy testified that the connector has no power except to ignite the fuse and that it is not an explosive of any kind; that while connectors are about 1⅜ inches long, his company manufactures fuses in continuous lengths of approximately 3,500 feet, which are sold in minimum and maximum lengths of from 50 to 3,000 feet, but that, in mining, the length generally used is from 5 to 20 feet.

The second witness, David J. Andrew, testified that he had been employed by the Ensign-Bickford Co. as manager of research for a period of 6 years and was quite familiar with the production and use of the imported commodity, having seen it produced in Canada; that the powder used in the connector is prepared by mixing pyropowder (which is nitrocellulose), antimony sulphide, lead peroxide, and a small percentage of calcium stearate; that the mixture is prepared in

granular form, and a small quantity is placed in the closed end of the connectors; then, a small second load of black powder is dropped on top of the mixture. The shells are then pressed to hold the material in place and a slot cut into them to accommodate the igniter cord.

Andrew examined the letters patent (exhibit 5) and stated that the imported merchandise was made in accordance with it.

In the pursuit of his duties as manager of research "into new products and new processes, development of new products and general management of the research laboratory," he was acquainted with the difficulties encountered in connection with blasting operations; that the problem of lighting fuses in correct order to obtain proper rotation was one most frequently met; that the necessity of having waterproof ends of the fuses for the safety of the miner was also a factor to be considered; that, with the use of the igniter cord and connectors, a miner could ignite a number of fuses by lighting only one piece of igniter cord and accomplish the operation with a high degree of safety.

On cross-examination, Andrew testified that his company handles connectors, igniter cords, and fuses, all of which are recognized as separate articles of commerce. He described the method by which connectors are employed in conjunction with igniter cords and fuses in much the same manner as explained by the witness LeRoy.

The testimony of witnesses LeRoy and Andrew is corroborated by recitals in the letters patent (exhibit 5), from which we set forth the following extracts:

In column 1, appears the statement—

Our invention relates to a means for igniting fuse as used in blasting operations, pyrotechnique displays, etc., and more particularly to a connecting device to propagate flame from a fuse of the ignition type such as igniter cord (also known as ignition cord) or flash cord, to a different type of fuse such as safety fuse.

  *   *   *   *   *   *   *

Due to differences in the burning characteristics of safety fuse and ignition fuse it is extremely difficult to connect the two types of fuse together so that ignition of the former by the latter is accomplished with certainty under all conditions of use. The most serious problem however is ignition failures due to moisture absorption at the connections between the ignition fuse and the safety fuse where of necessity, the burning composition of the safety fuse is exposed. Connectors placed on the ground surface adjacent to bore holes are quite often exposed to extreme conditions of moisture customarily found in blasting areas. It will be appreciated by those familiar with the art that safety fuse is difficult to ignite under moist conditions, and some means of protecting the exposed end thereof is desirable. The purpose of our connector therefore is to provide a practical means of holding ignition fuse in rigid attachment with its associated safety fuse so that positive ignition of the latter is accomplished under all conditions of moisture.

In column 3, it is stated that—

It is an object of the present invention to provide an effective waterproof connection between the end of a length of safety fuse and ignition fuse such as igniter cord or flash cord.

It is a further object of the present invention to produce a fusecord connector such that propagation of fire or ignition of safety fuse from a lighted ignition fuse, is accomplished under all conditions encountered in the field.

It is a still further object of our invention to produce a connecting device to which igniter cord or flash cord may be attached quickly in the field, but rigid enough to withstand the effects of blasts from neighbouring explosive charges.

The objects of the present invention are accomplished by the use of a connector which consists of a cylindrical tube similar in size to a standard blasting cap, and containing a small amount of an ignitable composition either in the form of a plug or a pressed charge. One end of the connector is open for insertion of a length of safety fuse, and a groove is cut at the opposite end for insertion of ignition fuse such as igniter cord or flash cord.

With the foregoing salient facts of record, we are confronted with the question whether the imported connectors are, as claimed by plaintiffs, "mining, blasting, or safety fuses of all kinds," as provided in paragraph 1517, *supra*, or "all other explosive substances, not specially provided for," described in paragraph 1687, *supra*.

We shall consider these claims in inverse order. In their brief, plaintiffs state that "The evidence conclusively establishes that Exhibit 1 is a pyrotechnic device * * * and contains black powder which burns but does not explode."

Plaintiffs also invite our attention to the Dictionary of Tariff Information (1924) and to the following quotation from page 306:

**EXPLOSIVES. General.** Explosives are used principally for blasting, signaling, pyrotechnics, and for military and sporting purposes.

Blasting explosives include mainly black powder, nitroglycerin preparations, and the so-called "permissible explosives," which have passed certain tests of the Bureau of Mines and are regarded as safe for use with proper precautions in coal mines.

While, as stated by the witness Andrew, the powder used in the connectors is prepared by mixing pyropowder (nitrocellulose), antimony sulphide, lead peroxide, and a small percentage of calcium stearate, stated by the witness to be inflammable but not explosive, we are of the opinion that the articles do not fall within the scope of the definition of "explosives" above quoted. Moreover, when the witness Andrew was asked if these connectors could be used in coal mines, he replied "No, sir. In the ordinary sense of the word it would be considered not permissible, that is things with open flames would not be used underground in coal mines. I certainly would never recommend taking this device or igniter cord into a coal mine."

The definition quoted above seems to contemplate blasting explosives "which have passed certain tests of the Bureau of Mines and are regarded as safe for use with proper precautions in coal mines." Inasmuch as both witnesses, who were well qualified on the subject, stated unequivocally that the connectors are not explosives, we are clearly of the opinion that the subject merchandise does not meet the descriptive language of said paragraph 1687.

We now turn our attention to what appears to be the main reliance of plaintiffs that the commodity should be classified within the provision for "mining, blasting, or safety fuses of all kinds."

In support of this contention, plaintiffs cite the definition of the word "fuse," as it appears in Webster's New International Dictionary (1951), which reads—

fuse, * * * 1. Any of various devices, as a tube, casing, cord, or the like, filled or impregnated with combustible matter, or a kind of detonator, by means of which an explosive charge is ignited, * * *.

Reference is also made by plaintiffs to the Summary of Tariff Information (1929), wherein the following appears at page 1968:

### MINING, BLASTING, AND SAFETY FUSES

Description and uses.—A fuse is a tube, *usually of fabric*, filled with an inflammable compound. It is used in connection with a blasting cap to detonate a charge of high explosive. [Emphasis added.]

While the latter definition describes a fuse as a tube "usually of fabric, filled with an inflammable compound," the connectors in controversy are of brass which are not *filled* but contain a very small quantity of an inflammable compound. Furthermore, they are not "used in connection with a blasting cap to detonate a charge of high explosive" but serve only as a connecting link between portions of igniter cord, which latter ignite fuses connected with blasting caps to detonate charges of high explosives. The most that might be said of the subject connectors is that they are ingenious devices designed to serve as connecting links in lines of igniter cord which, as stated in plaintiffs' brief, "insure the firing of the various charges of explosive in the proper rotation for most efficient operation, to overcome failures caused by moisture conditions and to insure the safety of the miner." They are, therefore, mere accessories for use in conjunction with lighter cords which, in turn, ignite fuses leading to detonation caps in mining or blasting.

The evidence is clear that connectors, igniter cords, and fuses, are separate and independent articles of commerce, each one of which is dealt with by its particular name. Moreover, it is difficult to believe that Congress, in specifying a rate of duty at $1 *per thousand feet* for "mining, blasting, or safety fuses," intended to embrace such articles as those here in controversy, which are approximately 1⅝ inches in length.

Note *United States* v. *La Manna, Azema & Farnan et al.*, 14 Ct. Cust. Appls. 123, T. D. 41647, wherein it was held that certain pearl onions, peeled, pickled, and contained in small bottles, for use as a condiment, were properly classifiable as vegetables, preserved, not specially provided for, and dutiable at an ad valorem rate rather than

as "onions," which were dutiable at the rate of 1 cent per pound. In the course of its opinion, the court observed—

* * * A consideration of the *eo nomine* provisions for onions and other vegetables, and the pickled vegetable paragraph leads us to the conclusion that Congress did not intend that the paragraph for onions at 1 cent per pound should be broad enough to include merchandise like that involved herein. It would require about nine of the small bottles containing the pickled onions to equal one pound, upon which there would be a duty of but 1 cent. Is it reasonable to presume Congress could have intended such a result? We think not.

By analogic reasoning, since 1 box of the imported connectors, containing 100 pieces, would measure approximately 11.47 feet, it would require in the neighborhood of 87 boxes, containing 100 connectors each, to equal 1,000 feet upon which there would be a duty of but $1, a result which it is not "reasonable to presume Congress could have intended."

Upon the record and for the foregoing reasons, we overrule the protest on all grounds.

Judgment will be entered accordingly.